2020 IL App (4th) 180652

NO. 4-18-0652

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 21, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| DENNIS MYLES, | ) | No. 17CF172 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court with opinion. Presiding Justice Steigmann and Justice DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1        In May 2017, the State charged defendant, Dennis Myles, with three counts of aggravated criminal sexual abuse. In March 2018, the trial court found defendant guilty beyond a reasonable doubt of all three charges. In September 2018, the court sentenced defendant to 36 months' probation and a term of 180 days' imprisonment.

¶ 2        Defendant appeals, arguing (1) he received ineffective assistance of counsel where counsel stipulated to the admission of recordings of El. C.'s and Em. C.'s statements at the Children's Advocacy Center (CAC) and (2) his constitutional right to be present at all critical stages of his trial was violated when the trial court privately viewed the recordings. For the following reasons, we affirm the trial court's judgment.

¶ 3                        I. BACKGROUND

¶ 4	In May 2017, the State charged defendant with three counts of aggravated criminal sexual abuse, a Class 2 felony (720 ILCS 5/11-1.60(c)(1)(i), (g) (West 2016)). The charges alleged defendant was 17 years of age or older and committed an act of sexual conduct with El. C. and Em. C., who were under 13 years of age, in that defendant knowingly rubbed his hand on or about El. C.'s vagina (count I), Em. C.'s vagina (count II), and Em. C.'s breasts (count III).

¶ 5	A. Motion *in Limine*

¶ 6	In October 2017, the State filed a motion *in limine* to admit hearsay evidence pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2016)). Specifically, the State sought to present hearsay evidence in the form of out-of-court statements the minors made to their mother, J.C., and recorded statements the minors made to Jo Sipes at the Livingston County CAC. Prior to trial, the State informed the court it had a stipulation to present to the court regarding the recorded statements made at the CAC. Defense counsel indicated he agreed to the stipulation. The parties filed a written stipulation that Jo Sipes was "an experienced and certified forensic interviewer" and had "been trained in forming questions in a manner which does not elicit a certain response." Further, Sipes would testify the recordings of the forensic interviews she conducted accurately depicted the interviews and were complete recordings with no errors. Finally, the stipulation stated the recordings of the interviews "are admissible under 725 ILCS 5/115-10 if the requirements of 725 ILCS 5/115-10(2) are met."

¶ 7	B. Bench Trial

¶ 8	In November 2017, defendant's bench trial began. Over the course of three nonconsecutive days, the court heard the following evidence.

¶ 9                                    1. *Em. C.*

¶ 10          Em. C. testified she was nine years old and in the fourth grade. Em. C. identified

defendant as her "Grandpa Dennis." According to Em. C., the previous year defendant would

watch her and her younger sister El. C. "a couple times a month" while her mother worked. At

the beginning of the 2016 school year, there was an incident with defendant that made Em. C.

uncomfortable. Em. C. testified she was at home with defendant and El. C. Em. C. and defendant

were sitting on the couch watching television, and Em. C. asked defendant to scratch her back.

Em. C. testified defendant began scratching her back under her shirt and then moved his hands

forward until he was scratching her "ninnies." Em. C. testified she referred to her breasts as

"ninnies." Em. C. testified she also sometimes referred to her breasts as "mosquito bites"

because of something funny El. C. once said. According to Em. C., defendant tickled her

"ninnies" with both hands for about one minute.

¶ 11          Em. C. testified a second incident occurred approximately two weeks later, again

while she and defendant sat on the couch watching television. Em. C. stated, "I was kind of

laying with my feet up; and he was sitting next to me; and he sort of like moved his hand over

my private." Em. C. testified she referred to her vagina as her "private." According to Em. C.,

defendant cupped his hand over her vagina and held his hand there for approximately five

minutes. Em. C. testified she did not tell anyone about the incidents right away because she was

scared. Em. C. usually referred to her vagina as her "froggy," but she used "private" while

testifying because she was embarrassed.

¶ 12          Toward the end of third grade, Em. C.'s mother asked her if anybody had ever

touched her in a way that made her uncomfortable. Em. C. told her mother about the two

incidents with defendant. Em. C. talked about the incidents with her mother before Sipes interviewed her. All her mother told her was "to say the truth."

¶ 13                                          2. *El. C.*

¶ 14        El. C. testified she was five years old and attended kindergarten. According to El. C., when her mother worked, various people would babysit her and Em. C. El. C. stated there was an incident with defendant that made her uncomfortable. El. C. stated she, Em. C., and defendant sat on the couch watching the movie "Minions." According to El. C., defendant sat between the two girls. El. C. testified she was watching the movie and defendant began rubbing her "private spot," meaning her vagina. Defendant rubbed El. C.'s vagina over her clothes in a circle with one hand. El. C. testified defendant did not rub her stomach.

¶ 15        El. C. testified she did not remember what time of year the incident occurred, but she thought it happened between Christmas and Easter. El. C. testified defendant never put his arm around her shoulders while they watched television. El. C. never asked defendant to tuck her into bed at night. According to El. C., she told her mother about the incident the following morning.

¶ 16                                    3. *CAC Interviews*

¶ 17        Following Em. C.'s and El. C.'s testimony, the State moved to admit the video recorded interviews at CAC. The trial court asked if it should review the recordings before the next hearing, and the State indicated the court should do so. The court asked if there was any objection to that, and defense counsel responded, "No, Your Honor."

¶ 18        At the time of the recorded interview, El. C. was four years old. Following general questions about El. C.'s family and school, Sipes asked, "Do you know what you're here to talk about today?" El. C. responded affirmatively, and Sipes said, "Tell me what you're here

to talk about." El. C. responded, "One day, my grandpa, he was rubbing my private." El. C. indicated her grandfather used his hand on top of her clothes. El. C. said the incident occurred on the couch at her house while her mother was at work. El. C. sat in between defendant and Em. C.

¶ 19        Sipes asked El. C. to describe "how Grandpa did that," and El. C. responded, "He just did it." El. C. marked a diagram when Sipes asked her to show "private part" on a picture. Although El. C. could not remember what day the incident occurred, she agreed she was four years old when the incident occurred. El. C. said her grandfather used one hand and his other hand was on the couch. El. C. stated she told him to please stop and he stopped when she got up. El. C. told her mother about the incident the following morning.

¶ 20        At the time of the recorded interview, Em. C. was nine years old. After some general questions about family and hobbies, Em. C. acknowledged she was not in trouble and mentioned talking with her mother. Sipes asked what Em. C.'s mother said about the interview. Em. C. responded that she needed to tell the truth and say everything that she told her mother. Em. C. denied being uncomfortable. Sipes asked Em. C. to tell her "what happened."

¶ 21        Em. C. said she asked her grandfather to scratch her back while they were sitting on the couch. Em. C. described how her grandfather moved forward to scratch her chest under her shirt. Sipes asked Em. C. what she called that part of her body, and Em. C. responded "mosquito bites" because they were little. Sipes asked if her grandfather was "scratching, or something different," and Em. C. responded the scratching turned into rubbing. Em. C. then asked if she could go outside and left. Sipes asked Em. C. what her grandfather's name was, and Em. C. said, "Grandpa Dennis."

¶ 22        Sipes asked if her grandfather had touched Em. C. anywhere else on her body, and Em. C. motioned toward her vaginal area. Em. C. stated defendant touched her over her

clothes and that was the first incident. Em. C. estimated the incident occurred near the beginning of her third grade school year. Sipes asked if both incidents occurred last year, and Em. C. responded affirmatively. Sipes asked about the touching of her "mosquito bites" and Em. C. said that happened first because it was hotter outside. Em. C. later stated the touching of her "froggy" was the first incident. Em. C. said defendant touched her vagina with one hand in a scratching or rubbing motion. Em. C. explained she told her mother about the incidents because her mother asked if anyone touched her.

¶ 23                                          4. *J.C.*

¶ 24            J.C. testified defendant was her stepfather. According to J.C., she worked evenings and some days at a restaurant. A few times a month, defendant would watch her daughters while J.C. worked. In April 2017, J.C. and El. C. were sitting on the couch watching television. J.C. sat with her arm wrapped around El. C., and El. C. rubbed J.C.'s leg. J.C. testified El. C. was an affectionate child and J.C. wore soft pajama pants that El. C. liked. According to J.C., El. C. rubbed "closer and closer and touched [J.C.] in between [her] legs in [her] private area." J.C. testified she grabbed El. C.'s hand and said, "watch your hands. We don't touch people right there."

¶ 25            According to J.C., El. C. got nervous, jumped off the couch, and crouched on the other side of the ottoman. J.C. asked her what was wrong, and El. C. then ran to the front door and all the way upstairs. J.C. testified this was an unusual reaction to her redirection. J.C. followed El. C. upstairs and found her sitting in her closet with her knees pulled up to her chest, her arms wrapped around her legs, and her head down. According to J.C., she got down to eye level with El. C. and asked what was wrong. J.C. promised El. C. she could skip pre-

kindergarten that day if she told J.C. what was going on. J.C. denied ever mentioning defendant or asking El. C. if she had been touched inappropriately.

¶ 26 J.C. testified El. C. looked up and quietly said defendant "rubbed her froggy." J.C. stated her daughters referred to their vaginas as "froggy" or "private" and referred to their breasts as "ninnies" or "mosquito bites." El. C. indicated the incident occurred the night before while watching the Minions movie. A few days later, J.C. sat Em. C. down and told her to feel free to tell J.C. anything because J.C. did not want to keep secrets or have Em. C. feel uncomfortable about telling her anything. J.C. denied telling Em. C. about El. C.'s disclosure prior to this conversation. According to J.C., Em. C. told her about the incident where defendant began scratching her back and moved his hands to rub and scratch her "ninnies."

¶ 27 J.C. testified she asked Em. C. when and where the incident occurred. Em. C. indicated it happened in the home where the family had resided for only a little over a year. According to J.C., the girls had a good relationship with defendant and loved spending time with him. J.C. also had a good relationship with defendant. J.C. told her mother, defendant's wife, about the incidents the girls described, and she was not supportive of the idea of going to the police. J.C. took the girls to Florida to visit their father. J.C. testified, "So I just went to Florida to let them [(Em. C. and El. C.)] spend some time with their dad after hearing about this and to try to clear my head and figure out what I should do." After returning from Florida, J.C. reported the incidents to the police approximately one to two weeks after El. C. initially reported the incident. According to J.C., her mother did not appear to believe the girls and did not support reporting the incidents to the police.

¶ 28 5. *Defendant*

¶ 29        Defendant testified he was Em. C.'s and El. C.'s stepgrandfather and he had a great relationship with the girls. Defendant babysat the girls at their house on a fairly frequent basis until the previous April. According to defendant, he frequently sat on the couch with the girls playing video games or watching television. The girls would frequently be physically close to defendant, and he would put his arms around them. Defendant testified Em. C. liked to have her back scratched. Defendant stated, "Sometimes if it was just a quick itch she would sit next to me and just scratch her back. She would life her shirt up. In other instances, she would lay next to me; and she would be watching television. She liked to have the whole back scratched, more like a back rub type of deal; and she would lay there. A couple of times she fell asleep on me while I was doing it."

¶ 30        Defendant testified he never participated in bathing or bedtime with the girls. When asked if he ever touched the girls in the breast area or groin, defendant responded, "No. I do not believe so." Defendant denied intentionally touching them in those places. Defendant stated he remembered the incidents the girls described. Defendant recalled babysitting the girls at the beginning of the school year and sitting down with Em. C. on the couch. According to defendant, Em. C. threw her leg over his lap and asked him to "squish" or massage her legs. Defendant testified he massaged the whole length of Em. C.'s thigh but did not touch her privates.

¶ 31        The second incident with Em. C. occurred when Em. C. asked defendant to scratch her back and he reluctantly agreed to do so. El. C. came into the room and asked to have her back scratched. El. C. jumped over the top of the couch and stepped on Em. C. Em. C. "came back around, like raised her arm like she was going to push her sister away." Defendant testified his hand was inside her shirt and got stuck because he wore a lot of rings. Defendant yelled at El.

C. for jumping on the couch and yelled at Em. C. because he did not want to scratch her back. Em. C. gave defendant a strange look and left to see her friends.

¶ 32    The incident with El. C. occurred on April 2, 2017. Defendant sat on the couch and helped El. C. find a cartoon to watch. Defendant testified, "So I asked [El. C.] if she wanted some help so I grabbed the remote; and she crawls up into my arm; and I grab my arm like this; and we find the cartoon; and we start the cartoon." According to defendant, El. C. told him she loved him and he "rubbed her where [his] hand was."

¶ 33    Defendant was asked about a recorded statement he gave to Detective Gary Beier. Defendant recalled showing the detective how he raised his hands up after getting his hands out of Em. C.'s shirt after the second incident. Defendant testified that Em. C. did not turn her body toward him when El. C. jumped on the couch. According to defendant, he never mentioned an incident where Em. C. asked him to "squish" her legs to the detective. Defendant explained, "At the time I didn't know she said I had touched her frog." When asked why he specifically remembered the incident, defendant testified, "When I saw the interview and she said she put her leg over me, yeah, of course I'm going to remember it then." Defendant explained the incidents he described best matched the descriptions given in the recorded interview.

¶ 34                              6. *Gary Beier*

¶ 35    Gary Beier, a detective with the Dwight Police Department, testified he interviewed defendant in April 2017. According to Beier, defendant described an incident where he was rubbing Em. C.'s back and El. C. jumped on the couch. Defendant said Em. C. turned her body toward him. Defendant never told Beier that his hand got stuck in Em. C.'s shirt or about an incident where Em. C. asked him to "squish" her legs.

¶ 36                              C. Verdict and Sentence

¶ 37          In March 2018, the trial court entered a written order finding defendant guilty beyond a reasonable doubt of all three charges. The court made extensive factual findings and found Em. C. and El. C. to be credible witnesses. The court found Em. C.'s testimony consistent with the recorded interview. Although Em. C. confused which incident occurred first, the details of each incident were consistent. The court found El. C.'s testimony consistent with the recorded interview. The court found El. C. repeated the same story four separate times—twice to her mother, once during the recorded interview, and once in court. The court further found El. C.'s testimony was corroborated by the fact El. C. told her mother about the incident the very next day.

¶ 38          The trial court found "some of defendant's answers and face expressions on direct examination were unusual and not entirely appropriate to the question asked." The court found defendant was not a credible witness and his demeanor was evasive and argumentative. The court concluded the State presented credible and consistent evidence that defendant engaged in the acts and met its burden of proof beyond a reasonable doubt on all counts.

¶ 39          In September 2018, the trial court held a sentencing hearing. The court sentenced defendant to 36 months' probation and a term of 180 days' imprisonment.

¶ 40          This appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42          On appeal, defendant argues (1) he received ineffective assistance of counsel where counsel stipulated to the admission of recordings of El. C.'s and Em. C.'s statements at the CAC and (2) his constitutional right to be present at all critical stages of his trial was violated where the trial court privately viewed the recordings.

¶ 43                          A. Ineffective Assistance of Counsel

¶ 44 Defendant argues he was denied his right to effective assistance of counsel where defense counsel stipulated to the admission of the recorded CAC interviews. Defendant argues the recordings were inadmissible. The State argues the record is insufficient to evaluate defense counsel's performance because the decision to stipulate to the admission of the videos may have been sound trial strategy. The State further argues this court need not decide whether counsel's stipulation was ineffective assistance because defendant has failed to show prejudice. Specifically, the State asserts the recordings would have been admitted without the stipulation because the time, content, and circumstances of the statements provided sufficient safeguards of reliability.

¶ 45 A claim of ineffective assistance of counsel is governed by the familiar framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767. The deficient-performance prong requires a defendant to show that counsel's performance was objectively unreasonable under prevailing professional norms. *People v. Veach*, 2017 IL 120649, ¶ 30, 89 N.E.3d 366. Under the prejudice prong, defendant must show a reasonable probability that but for counsel's deficient performance the outcome of the proceeding would have been different. *Id.* "A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Id.* A defendant must satisfy both prongs to prevail on a claim of ineffective assistance of counsel. *Id.*

¶ 46 Section 115-10 of the Code allows certain exceptions for otherwise inadmissible hearsay evidence. 725 ILCS 5/115-10 (West 2016). The statute allows the admission of out of

court statements made by the victim in a prosecution for a sexual act perpetrated upon or against a child under the age of 13. *Id.* § 115-10(a). The statute, in relevant part, imposes preconditions to the admissibility of this hearsay evidence as follows:

> "(b) Such testimony shall only be admitted if:
>
> (1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and
>
> (2) The child *** either:
>
> (A) testifies at the proceeding[.]" *Id.* § 115-10(b).

¶ 47　　　　As noted, the State argues this court need not determine whether counsel's stipulation to the admission of the recordings was objectively unreasonable because defendant has failed to demonstrate prejudice where the recordings were admissible because the time, content, and circumstances of the recordings provided sufficient safeguards of reliability. To demonstrate prejudice, defendant must show a reasonable probability that the outcome of the proceeding would have been different but for counsel's allegedly unreasonable performance. Assuming *arguendo* that defense counsel had successfully challenged the admission of the recordings, we conclude the outcome of defendant's trial would not have been different. It is well settled that "[t]he testimony of a single witness, if it is positive and the witness credible is sufficient to convict even though it is contradicted by the accused." *People v. Hampton*, 44 Ill. 2d 41, 45, 253 N.E.2d 385, 387 (1969). Moreover, it is the function of the trier of fact to weigh the credibility of witnesses. *Id.*

¶ 48    Here, the trial court found Em. C., El. C., and J.C. to be credible witnesses and defendant not to be a credible witness. Em. C. testified defendant touched her inappropriately on two occasions. Em. C. testified defendant was scratching her back and moved his hands around the sides of her body and scratched and rubbed her "ninnies," or breasts. Em. C. testified on a second occasion defendant rubbed her "private" and her "ninnies" while watching a movie. El. C. testified that defendant rubbed her "froggy," or vagina, in a circular motion with his hand while watching a movie. The girls' testimony provided consistent evidence of defendant's conduct. Moreover, the girls' testimony was corroborated by J.C.'s testimony that the girls disclosed incidents consistent with their trial testimony. Defendant did not object to J.C.'s testimony at trial and does not raise any issues with her testimony on appeal. Even if counsel had successfully blocked the admission of the recordings, this evidence, combined with the trial court's explicit findings of credibility, shows there was no reasonable probability the outcome of the trial would have been different.

¶ 49    Defendant argues the trial court relied on the video recordings in making its findings and determining defendant's guilt. Even if we assume—without deciding—the recordings were essential to the trial court's finding of guilt, we agree with the State that the time, content, and circumstances of the recordings provide sufficient safeguards of reliability and would have been admissible regardless.

¶ 50    The State argues both girls made detailed disclosures to Sipes in response to open-ended questions. The time, content, and circumstances of the recorded interviews provide sufficient safeguards of reliability because the girls made the statements in response to open-ended questions, their descriptions of the incidents were consistent with their disclosures to their

mother, and the recorded statements were made shortly after disclosing the incidents to their mother.

¶ 51     Defendant argues Em. C.'s statement was incongruous and unreliable because she described the two incidents as occurring seven months apart or as happening in the same month. Defendant further argues Em. C.'s confusion as to which incident occurred first renders the recorded interview inadmissible. While there might have been minor inconsistencies in Em. C.'s recorded interview—and minor inconsistencies with her trial testimony—we conclude this is insufficient to show the recording was unreliable. Although Em. C. did switch the order of the two incidents and described the incidents as being separated by up to seven months or as having happened in the very same month, the details of the specific incidents were consistent in both the video and the trial testimony. Em. C. consistently stated defendant began scratching her back while sitting on the couch and then moved his hands forward to scratch and rub her "ninnies." Em. C. consistently described defendant touching her "froggy" with one hand while she was prone on the couch. These consistent details weigh in favor of finding the recordings reliable.

¶ 52     Defendant complains the State failed to address the following factors related to the reliability of the recorded interviews: "(1) the spontaneity and consistent repetition of the statement; (2) the mental state of the child in giving the statement; (3) the use of terminology not expected in a child of comparable age; and (4) the lack of a motive to fabricate." *People v. Bowen*, 183 Ill. 2d 103, 120, 699 N.E.2d 577, 586 (1998). Defendant asserts these factors weigh against finding a sufficient safeguard of reliability. We disagree. First, El. C.'s disclosure to her mother was spontaneous and unprompted. Although J.C. asked El. C. what was wrong, J.C. made no mention of defendant or inappropriate touching before El. C. stated her grandfather touched her "froggy." This is entirely consistent with her disclosure during the recorded

interview. Similarly, J.C. approached Em. C. and asked if Em. C. needed to disclose anything, but again J.C. made no mention of defendant or inappropriate touching before Em. C. disclosed the two incidents. Em. C.'s disclosures during the recorded interview were consistent, even though she confused the timeline. This is understandable given the intervening time between the incidents and her interview. Moreover, as discussed above, the details of the incidents themselves remained remarkably consistent from her recorded interview to her trial testimony.

¶ 53        Defendant complains the State failed to address Em. C.'s selective recall regarding her mother reading a specific weather report the day of the first incident. Defendant argues this recollection is suspicious given her vacillation on the "highly significant details" of which incident occurred first and how much time intervened between the two incidents. We disagree that Em. C.'s recollection of these details sows doubt about the reliability of the recorded interview. Again, both girls made detailed, consistent disclosures in response to open-ended questions by a trained forensic interviewer. These interviews were conducted just one or two weeks after they made the disclosures to their mother. The spontaneity and consistency of the statements and the mental state of the girls in the recorded interviews weighs in favor of the reliability of the recorded interviews. Finally, J.C.'s testimony established the girls' lack of a motive to fabricate the incidents. J.C. testified the girls had a great relationship with defendant and loved spending time with him. Nothing in the record indicates the girls had any reason to fabricate the incidents. As such, this factor further weighs in favor of the reliability of the recorded interviews.

¶ 54        We conclude defendant has failed to show how defense counsel's allegedly ineffective assistance prejudiced him where (1) even if the recorded interviews were not admitted into evidence there is no probability the outcome of his trial would have been different

- 15 -

and (2) the recorded interviews would have been admitted if counsel had not stipulated to their admission.

¶ 55                                    B. Right to be Present at all Critical Stages

¶ 56          Defendant next argues his right to be present at all critical stages of his trial was violated where he was not present when the trial court viewed the recorded interviews. Defendant concedes this argument has been forfeited but asserts this court should review the claim under the second prong of the plain-error doctrine.

¶ 57          "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2 403, 410-11 (2007). The first step in plain-error analysis is to determine whether error occurred. *Id.*

¶ 58          As noted, defendant asserts this claim should be evaluated under the second prong of the plain-error doctrine. In support of this argument, defendant relies on *People v. Lucas*, 2019 IL App (1st) 160501, 141 N.E.3d 341.

¶ 59          "Generally, the United States and Illinois Constitutions afford criminal defendants the right to be present at all critical stages of the proceedings, from arraignment to sentencing." *Id.* ¶ 12. However, "[u]nder the due process clause of the fourteenth amendment, a criminal defendant's right of presence is violated only when his absence results in the denial of a fair and just trial." *People v. Lofton*, 194 Ill. 2d 40, 67, 740 N.E.2d 782, 797 (2000). The question is "whether the defendant's presence at the proceeding would have contributed to his opportunity

to defend himself against the charges." *Id.* "The justice or injustice of the exclusion of the defendant must be determined in the light of the whole record." *Id.* In determining whether a defendant's right to be present has been denied, our review is *de novo*. *People v. O'Quinn*, 339 Ill. App. 3d 347, 358, 791 N.E.2d 1066, 1075 (2003).

¶ 60    In *Lucas*, the trial court viewed a video of the defendant's traffic stop in chambers with defense counsel and the prosecutor. *Lucas*, 2019 IL App (1st) 160501, ¶ 5. The appellate court concluded the defendant's "absence from the video viewing affected the trial's fairness because she was unable to view the evidence against her and aid in her own defense." *Id.* ¶ 14. Neither the trial court nor defense counsel informed the defendant that she had a right to be present during the presentation of the video evidence. *Id.* Accordingly, the appellate court concluded the defendant had not meaningfully waived her right to be present when she agreed to the video viewing procedure. *Id.* The appellate court concluded the presentation of evidence at trial was a critical stage of the proceedings, the video involved a significant portion of the evidence against the defendant, the trial court relied on the video in finding the defendant guilty, and nothing in the record showed the defendant had viewed the video. *Id.* ¶¶ 15-16.

¶ 61    The appellate court further stated,

> "[T]he United States Supreme Court has explained, 'The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment' and 'a defendant has a due process right to be present at a proceeding whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." (Internal quotation marks omitted.) *Id.* ¶ 15 (quoting *United States v. Gagnon*, 470 U.S. 522, 526 (1985)).

The appellate court found the defendant's absence from the video viewing impacted her right to testify in her own defense because, in order to decide whether to testify, "the defendant must be aware of *all* of the State's evidence." (Emphasis in original.) *Id.* ¶ 19. Accordingly, the appellate court concluded the violation of the defendant's right to be present had a cascading impact on fundamental rights that amounted to second-prong plain error. *Id.* ¶ 21.

¶ 62        We find *Lucas* distinguishable. First, the record in *Lucas* contained no indication of whether the defendant had knowledge of the content of the video. *Id.* ¶ 16. Here, the record indicates defendant viewed the videos. Defendant testified he remembered one particular incident with Em. C. when he saw the video where she stated she put her leg over defendant's lap. Defendant further testified the incidents he remembered best matched the descriptions given in the recording. Unlike *Lucas*, the record shows defendant viewed the recording. Defendant argues the record only reveals he saw some portion of the video at some point but that nothing shows he saw the complete interviews or that his viewing was recent enough to recall the particulars of the statements. However, defendant cites no authority to support this argument. Moreover, as the *Lucas* court noted, the right to be present is rooted in the confrontation clause. Here, both Em. C. and El. C. testified at trial, and defense counsel rigorously cross-examined both witnesses, including asking the witnesses about inconsistencies between their trial testimony and the recorded interviews.

¶ 63        Defendant argues the recordings were a significant portion of the evidence against him. Defendant asserts the appellate court in *Lucas* found a constitutional violation of the defendant's right to be present where the trial court viewed a video of her traffic stop outside of her presence where "the video of the traffic stop involved a significant portion of the evidence against [the defendant]. Indeed, the court relied on the video in finding [the defendant] guilty."

*Id.* ¶ 15. In *Lucas*, the trial court explicitly relied on the video of the defendant's driving under the influence traffic stop. *Id.* ¶ 7. The trial court stated the video showed the defendant's driving was "disturbing," the defendant admitted to drinking alcohol, and the defendant was "belligerent." *Id.* The court also noted the defendant's general behavior indicated she was under the influence of alcohol. *Id.*

¶ 64 Here, the video recordings were not as significant a portion of the evidence as the video was in *Lucas*. As discussed above, the evidence in this case was sufficient to prove defendant guilty beyond a reasonable doubt without the videos. The trial court found Em. C., El. C., and J.C. to be credible witnesses. Although the court did find the videos corroborated their testimony, the court clearly credited the testimony itself. Moreover, the videos did not depict defendant's conduct but the witnesses' statements—witnesses who testified at trial where defendant had the opportunity to confront them. See *People v. Groebe*, 2019 IL App (1st) 180503, ¶¶ 51-52, 145 N.E.3d 411 (declining to find the defendant's absence from the video viewing caused the proceedings to be unfair or resulted in the denial of an underlying substantial right, including the right to confront witnesses where the witness testified and the defendant had the opportunity to confront and cross-examine them).

¶ 65 Upon our review of the entire record, we conclude defendant's presence at the video viewing would not have contributed to his opportunity to defend himself against the charges where he had no objection to the court viewing the videos outside of his presence, he saw the videos himself, the witnesses in the videos testified in open court where defendant had the opportunity to confront and cross-examine them, and defendant was aware of all the State's evidence when he decided to testify in his own defense. Because we conclude defendant's right

to be present was not violated, we conclude no error occurred. *Piatkowski*, 225 Ill. 2d at 565.

Accordingly, we affirm the judgment of the trial court.

¶ 66                                    III. CONCLUSION

¶ 67           For the reasons stated, we affirm the trial court's judgment.

¶ 68           Affirmed.

**No. 4-18-0652**

| | |
|---|---|
| **Cite as:** | *People v. Myles*, 2020 IL App (4th) 180652 |
| **Decision Under Review:** | Appeal from the Circuit Court of Livingston County, No. 17-CF-172; the Hon. Jennifer H. Bauknecht, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Amy J. Kemp, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Randy Yedinak, State's Attorney, of Pontiac (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |