2021 IL App (1st) 182331-U

No. 1-18-2331

Second Division
June 15, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 16 CR 8504 |
| v. | ) | |
| | ) | |
| PATRICK MCGOVERN, | ) | Honorable |
| | ) | Colleen A. Hyland |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant was not deprived of his constitutional right to be present at all critical stages where his absence for part of a pretrial hearing did not impact his ability to contribute to his defense.

¶ 2     Following a jury trial in 2018, defendant Patrick McGovern was found guilty on one count of predatory criminal sexual assault of a child and sentenced to 10 years in prison. He now appeals, arguing that he was denied his right to be present at all critical stages of the proceedings when the

trial court privately viewed a recording of the victim's forensic interview for purposes of determining the interview's admissibility under section 115-10 of the Code of Civil Procedure (Code) (725 ILCS 5/115-10 (West 2016)). For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In June 2016, defendant was indicted on one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)). The charge alleged that on or around April 30, 2016, defendant knowingly committed an act of sexual penetration by inserting his finger into the sex organ of K.N., who was then under 13 years of age.

¶ 5                              A. Section 115-10 Hearing

¶ 6      On November 2, 2016, the State filed a pretrial motion to admit certain statements made by K.N. pursuant to section 115-10 of the Code. Specifically, the State sought to admit (1) K.N.'s statements to her mother, A.T., and her mother's fiancé, C.N., on the day of the alleged incident and (2) K.N.'s video recorded statements to Bridget Carey during a forensic interview on May 2, 2016.

¶ 7      The section 115-10 hearing was held over two dates, April 12, 2017 and May 11, 2017. On the first day of the hearing, A.T. testified that on April 30, 2016, she was living in Tinley Park with C.N., K.N., and her son, L.N. K.N. was six years old and L.N. was three years old at that time. While the family lived in Tinley Park, defendant, who was C.N.'s "best friend," would often watch the children at their apartment on the weekends while A.T. and C.N. were at work. On the day in question, which was a Saturday, A.T. left the children at the apartment with defendant and went to work around 8 a.m. C.N. was already at work when she left.

¶ 8      When A.T. returned home for the day between 4:30 and 4:45 p.m., C.N. was then at home, waking up from a nap. A.T. called K.N. into the kitchen to help prepare dinner. As K.N. hopped

up on the kitchen counter, A.T. noticed a bulge of toilet paper stuffed in her underwear. A.T. asked K.N. about the toilet paper, and she responded that "Pat hurt her." A.T. took K.N. into a bedroom and asked for further details. K.N. pointed toward her vagina and stated that defendant "stuck his finger inside her." A.T. called C.N. into the bedroom on his cell phone so as not to alert defendant. A.T. asked K.N. to tell C.N. what happened, and K.N. again pointed toward her vagina and said, "Pat hurt me."

¶ 9    A.T. then took K.N. to the bathroom and asked her to pull out the wad of toilet paper. A.T. noticed that K.N.'s vagina "was extremely red and there was some blood." There was also blood on the toilet paper, which A.T. placed in a clean trash can liner. At that point, L.N. came into the bathroom and C.N. came in to get him. Eventually, A.T. heard defendant coming down the hallway, calling for C.N. She exited the bathroom and defendant told her that he needed to leave to go hang out with his cousin. Defendant then left, and A.T. and C.N. took K.N. to the hospital. On the way to the hospital, K.N. stated that while C.N. and L.N. were napping, she got onto the couch with defendant, who was playing video games. As she was lying on the couch with defendant, he pulled up her nightgown and put his finger inside of her.

¶ 10    C.N. testified that he started work at 4:30 a.m. on the day in question and returned home around 10 a.m. He and defendant played video games for a while and then put the children down for a nap. After playing some more video games, C.N. went into his bedroom to take a nap. He awoke around 4:45 p.m. and went into the kitchen where A.T. and K.N. were talking. The three then went into the bedroom to "ma[k]e it more private." In the bedroom, K.N. pointed toward her vagina and said that defendant had "touched [her] down there." A.T. brought K.N. to the bathroom and later called C.N. to join them. They "discussed the situation" until they heard defendant

coming down the hallway calling C.N.'s name. A.T. exited the bathroom and talked to defendant, who stated that he needed to leave to go see his cousin.

¶ 11    After defendant left, A.T. and C.N. took K.N. to the hospital. On the way there, K.N. stated that she went to see defendant on the couch because she was bored and that defendant lifted up her nightgown and "put his finger inside" of her.

¶ 12    Bridget Carey testified that she was employed as a forensic interviewer and therapist at All Our Children's Advocacy Center in Justice, Illinois. On May 2, 2016, she conducted a forensic interview with K.N., which was recorded. A copy of the interview video was admitted into evidence without objection from the defense.

¶ 13    After a brief cross-examination by defense counsel, the State tendered the video for the court to view on its own before making its ruling on the next court date. The court confirmed that defense counsel agreed to this arrangement and the hearing was adjourned.

¶ 14    On the next court date, May 11, 2017, the court stated that it had viewed the interview video. After hearing arguments from both parties, the court granted the State's motion to admit K.N.'s statements at trial, opining that K.N. "appear[ed] to be an intelligent young child, and her answers [we]re consistent with what she told her mother and stepfather." Accordingly, the court found that "the time, content, and circumstances of these statements do provide sufficient safeguards of reliability" to be used at trial.

¶ 15                                B. Jury Trial

¶ 16    The case proceeded to a jury trial on September 19, 2018.

¶ 17    At trial, A.T. and C.N. testified consistently with testimony given at the section 115-10 hearing.

¶ 18    K.N. testified that on April 30, 2016, she was six years old and lived in Tinley Park with A.T., C.N., and L.N. On that day, she was in her apartment with C.N., L.N., and defendant. Defendant was on the couch while C.N. and L.N. were napping. K.N. joined defendant on the couch, lying on top of his stomach for 20 to 25 minutes. During this time, defendant touched her "front private part" under her clothes with his pointer finger. K.N. did not remember which hand defendant used. She told him that it hurt and he "sort of apologized for it." K.N. went to the bathroom a few minutes later and noticed that it "stung" when she urinated. She balled up some toilet paper and put it in her underwear to stop the pain.

¶ 19    When A.T. came home from work, K.N. told her what happened. A.T. then took K.N. into the bathroom, and then to the bedroom because L.N. kept coming into the bathroom. K.N. also told C.N. about the incident while they were in the bedroom. Afterwards, they went to the hospital, where K.N. also told a nurse and police officers what had happened to her.

¶ 20    Tinley Park police officer Samantha Bishop testified that she spoke with A.T. and C.N. at the hospital on the night in question. She also collected a sexual assault kit and the clothes K.N. was wearing. Lyle Boicken, a forensic scientist for the Illinois State Police, testified that he examined the sexual assault kit and the wad of toilet paper that A.T. found in K.N.'s underwear. No semen was present on any of the samples, but the two stains tested on the toilet paper were positive for blood, as well as the DNA of one male and one female. The male DNA profile was consistent with defendant's DNA such that he could not be excluded as being the donor.

¶ 21    Carey testified regarding her May 2, 2016 forensic interview with K.N. Through Carey's testimony, the State introduced and published the video recording of the interview. The video shows that K.N. told Carey that she decided to lay with defendant on the couch while C.N. and L.N. were napping. She laid on defendant's stomach while he laid on his back. She was wearing

her nightgown and underwear. K.N. stated that defendant lifted up her nightgown and placed one of his hands inside her underwear, touching her vagina. K.N. told Carey that it "hurt" and "made [her] bleed." Defendant stopped after K.N. told him that he had hurt her. She did not remember defendant saying anything in response.

¶ 22    K.N. went to the bathroom a few minutes later because she thought it would ease the pain she was experiencing. She stated that it "hurt a lot" when she urinated and that there was "a little bit of red" in her urine. After using the bathroom, K.N. sat down with defendant and C.N. and watched the movie *Ant-Man*.

¶ 23    Later that day, A.T. came home and noticed the toilet paper in her underwear. K.N. would not tell A.T. what happened, so A.T. took her into a bedroom and continued to ask her what happened. K.N. reluctantly told A.T., at which point A.T. called C.N. into the room.

¶ 24    The State rested, and the defense moved for a directed verdict, which was denied.

¶ 25    R.K., C.N.'s mother, testified for the defense. R.K. recalled an incident when she was babysitting K.N. in November 2013. While she was giving K.N. a bath, she noticed K.N. "putting her finger in and out in her private area." R.K. also testified to another incident in July 2015 in which she observed K.N. "kissing and licking [L.N.'s] butt" while his pants and underwear were down. R.K. had not watched the children since October 2015.

¶ 26    Defendant testified on his own behalf. He stated that he began watching K.N. and L.N. on the weekends in October 2015, usually staying overnight on Friday and Saturday and leaving on Sunday morning. On the day in question, he woke up at the apartment around 8 a.m. when A.T. was leaving for work. The children were still asleep. Defendant watched TV until the children woke up and then he made them breakfast. They watched cartoons and played until C.N. came home from work around 10:30 a.m. Defendant and C.N. then played video games while the

children played in a different room. They played video games until around 1 p.m., at which point they both decided to take a nap. Defendant slept on the couch until approximately 1:45 p.m. When he awoke, K.N. was sleeping on top of him with her head on his chest. He moved her off him and went to the bathroom. When he returned from the bathroom, K.N. was awake and sitting up on the couch. Defendant decided to play video games until C.N. woke up. K.N. repeatedly asked to play the game with defendant, but he explained to her that her parents did not allow her to play those kinds of games. K.N. became "upset" and walked away. Defendant was still playing video games when A.T. arrived home from work with some groceries. He continued to play until around 5:30 p.m., when he left to go visit his cousin. He testified that although he typically spent Saturday nights at C.N.'s apartment, he had made prior arrangements to see his cousin because C.N. and A.T. were going to attend a wedding the following day.

¶ 27    The jury found defendant guilty of predatory criminal sexual assault of a child. The defense filed a motion for a new trial, which was denied. Following a hearing, defendant was sentenced to 10 years in prison.

¶ 28    This appealed followed.

¶ 29                                    II. ANALYSIS

¶ 30    On appeal, defendant argues that he was denied his right to be present during all critical stages of the proceedings when the trial court viewed K.N.'s recorded interview with Carey in between days of the section 115-10 hearing.

¶ 31    As a preliminary matter, we note that defendant concedes that he has forfeited the issue by not objecting in the trial court and by failing to raise the issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appeal, a defendant must object at trial and include the issue in a posttrial motion). Nevertheless, defendant asks this court to review

his claim under the plain error doctrine, which is a limited exception to the forfeiture rules that allows for appellate review of a forfeited issue if the evidence is closely balanced or if the error is so serious that it affected the integrity of the judicial process and the fairness of the defendant's trial. *People v. Belknap*, 2014 IL 117094, ¶ 48. The State, on the other hand, argues that defendant affirmatively waived review of the issue when his trial counsel acquiesced to the trial court viewing the video in between court dates. Thus, the State contends we should not invoke plain error review, as that doctrine applies only to errors that were forfeited, not waived. See *People v. Schoonover*, 2019 IL App (4th) 160882, ¶ 15.

¶ 32     Although often conflated or used interchangeably, the doctrines of waiver and forfeiture are distinct. *People v. Hughes*, 2015 IL 117242, ¶ 37. Forfeiture refers to "the failure to make the timely assertion of [a] right" and results in the loss of that right regardless of the defendant's knowledge or intent to relinquish it. *People v. Lesley*, 2018 IL 122100, ¶ 37. Waiver, on the other hand, is an intentional relinquishment of a known right. *People v. McClanahan*, 191 Ill. 2d 127, 137 (2000). A waiver of a constitutional right must be a voluntary, knowing, and intelligent act done with sufficient awareness of the circumstances and consequences thereof. *Id.* There is a presumption against waiver of a constitutional right such that a court will find waiver only if the record clearly establishes that the defendant knew of the right and deliberately relinquished it. *People v. Campbell*, 208 Ill. 2d 203, 211 (2003).

¶ 33     In this case, the record shows that defense counsel did not object when the trial court stated that it would view the video of K.N.'s interview in private between hearing dates. However, nothing in the record suggests that defendant personally agreed to this arrangement, or that he was even aware he could object or assert a right to be present. In these circumstances, we decline to equate defendant's silence with a knowing and voluntary relinquishment of any right. See *People*

*v. Martinez*, 2021 IL App (1st) 172097, ¶ 44 (finding that the defendant did not waive his right to be present by failing to object to the trial court viewing the victim's recorded interview in private). Accordingly, we find that defendant forfeited, rather than waived, his claim on appeal and will therefore review the issue for plain error.

¶ 34    The first step in a plain error analysis is to determine whether an error occurred. *People v. McDonald*, 2016 IL 118882, ¶ 48. Here, as noted, defendant's claim of error is a violation of his right to be present when the trial court viewed the interview video privately for purposes of the section 115-10 hearing.

¶ 35    A criminal defendant has a constitutional right to be present at all critical stages of the trial proceedings, from arraignment to sentencing. *People v. Lindsey*, 201 Ill. 2d 45, 55 (2002). This right, however, is not absolute. *Id.* at 56. A defendant does not have a right to be present when his " 'presence would be useless, or the benefit but a shadow.' " *People v. Lofton*, 194 Ill. 2d 40, 67 (2000) (quoting *Synder v. Massachusetts*, 291 U.S. 97, 106-07 (1934). The touchstone inquiry is "whether the defendant's presence at the proceeding would have contributed to his opportunity to defend himself against the charges." *Id.* Additionally, the right to be present is considered a "lesser right" which is not itself a substantial right but "a means to securing the substantial rights of a defendant," such as the right to confront witnesses and the right to present a defense. *People v. Salgado*, 2012 IL App (2d) 100945, ¶ 16. Thus, even where a defendant has a general right to be present, that right is violated only if the defendant's absence resulted in an unfair proceeding or the denial of an underlying substantial right. *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 151. Whether a defendant's absence rendered a proceeding unfair depends upon the record as a whole and the specific nature of the proceeding from which he was absent. *Martinez*, 2021 IL App (1st) 170297, ¶ 36. Our review is *de novo*. *People v. Lucas*, 2019 IL App (1st) 160501, ¶ 13.

¶ 36 Our supreme court has held that a section 115-10 hearing is a critical stage at which a defendant has the right to be present. See *Lofton*, 194 Ill. 2d at 72-73 (finding that the "defendant's presence at the section 115-10 hearing would have been useful in ensuring a more reliable determination as to the admissibility of [the alleged victim's] statements"). Subsequently, in *People v. Young*, 2013 IL App (4th) 120228, ¶ 24, the Fourth District ruled that, although the hearing itself was a critical stage, the trial court's viewing of the victim's recorded hearsay statements as part of that hearing was not. In affirming a conviction where the defendant was present for all aspects of the section 115-10 hearing except for the trial court's viewing of the recorded statements, the *Young* court concluded that the critical stage was only "the portion of the section 115-10 hearing that provided [the] defendant the opportunity to defend his position that the statements from those DVDs were inadmissible." *Id.* Because the defendant's presence during the viewing of the recordings "would have been useless" and "would not have contributed to his opportunity to defend himself against the charges," the viewing was not a critical stage at which the defendant had a right to be present. *Id.*

¶ 37 In this case, we likewise find that defendant's right to be present was not violated because his presence during the trial court's viewing of the interview video would not have contributed to his ability to defend himself. We note that, as in *Young*, defendant was present for all parts of the section 115-10 hearing apart from the viewing of the video. Moreover, defendant does not even argue that his presence during the viewing could have resulted in the video being excluded from trial. Instead, defendant argues that his presence was important for two main reasons: (1) it would have allowed him to "sift the testimony" against him and (2) it would have allowed him to gauge the trial judge's reaction to the video, which he says would have been helpful in making strategic

decisions such as whether to plead guilty, whether to elect a bench or jury trial, and whether to testify.

¶ 38    We disagree with defendant and find that he had all the information necessary to make informed strategic decisions once he was aware that the video would be admissible at trial. Although defendant's brief suggests "the first time he viewed the forensic interview may have been at trial," the record shows that he had ample opportunity to view the video prior to trial. The video was tendered to defense counsel on August 24, 2016, nearly eight months before the section 115-10 hearing and more than two years before the start of trial. At the very least, defendant had the opportunity to view the video at the trial itself before deciding whether to testify. Additionally, we note that the video merely detailed the conversation between K.N. and Carey, both of whom testified at trial and were available for cross-examination. See *People v. Myles*, 2020 IL App (4th) 180652, ¶ 65 (finding that a defendant's presence for the trial court's viewing of videos in a bench trial would not have contributed to the defendant's ability to defend himself where the defendant "saw the videos himself, the witnesses in the videos testified in open court where defendant had the opportunity to confront and cross-examine them, and defendant was aware of the all the State's evidence when he decided to testify in his own defense.").

¶ 39    To the extent defendant argues that his presence for the viewing would have allowed him to see the trial judge's reaction to the video evidence, we cannot say this rendered the proceedings unfair. First, defendant was able to observe the trial court during the testimony of A.T. and C.N., who essentially testified that K.N. made similar outcry statements as those captured on the video. Second, the fact that the trial court ruled the interview admissible, as well the court's comments in making that ruling, give some indication that the court found K.N.'s statements to be credible. See 725 ILCS 115-10(b)(1) (West 2016) (stating that the court will only admit the testimony if it

concludes that the time, content, and circumstances provided sufficient safeguards of reliability). Third, the trial court's opinion of the witnesses' credibility was less important at trial, as the case was ultimately tried by a jury. As such, the record shows that defendant's absence for part of the section 115-10 hearing did not undermine his ability to contribute to his defense or result in an unfair proceeding.

¶ 40    Our conclusion comports with this court's recent decision in *People v. Martinez*, 2021 IL App (1st) 172097. There, the defendant argued that his right to be present was violated when, after the video of the victim's recorded forensic interview was admitted at a section 115-10 hearing, the trial court watched the video in private during defendant's bench trial. *Id.* at ¶ 62. We affirmed, finding that the defendant was not denied any substantial right where the interviewer testified at trial and was subject to cross-examination, and where the defendant was aware of the contents of the video before deciding whether to testify. *Id.* ¶ 67.

¶ 41    Here, as in *Martinez*, defendant was able to fully participate in his own defense. He cannot show and does not argue that his presence at the trial court's viewing of the video would have affected the result of the section 115-10 hearing. More importantly, defendant was present for both the live testimony and the viewing of the video at trial, and thus was fully informed of the State's evidence when deciding whether to testify. Thus, his right to be present was not violated.

¶ 42    Finally, we note that *People v. Lucas*, 2019 IL App (1st) 160501, upon which defendant relies, is distinguishable. In *Lucas*, a DUI case tried in a bench trial, the trial court viewed the video of the defendant's traffic stop in chambers outside of the defendant's presence. *Id.* ¶¶ 5-6. This court concluded that procedure in *Lucas* violated the defendant's right to be present because it forced her to decide whether to testify without having firsthand knowledge of all the State's evidence against her. *Id.* ¶ 19. Here, in contrast, defendant was not absent for any part of trial.

Thus, he was aware of the State's evidence prior to deciding whether to testify, and the concerns we expressed in *Lucas* are not applicable.

¶ 43                                    III. CONCLUSION

¶ 44    In sum, defendant was not denied his right to be present at all critical stages of the proceedings below because his presence as the trial court privately viewed the video during the section 115-10 hearing would have added nothing to his ability to contribute to his defense. As no error occurred, there is no plain error. *Martinez*, 2021 IL App (1st) 172097, ¶ 69. Accordingly, the judgment of the circuit court is affirmed.

¶ 45    Affirmed.