# Illinois Official Reports

## Appellate Court

---

### *People v. Martinez*, 2021 IL App (1st) 172097

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MIGUEL MARTINEZ, Defendant-Appellant. |
| District & No. | First District, Second Division<br>No. 1-17-2097 |
| Filed | March 16, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-22749; the Hon. Paula M. Daleo, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Kieran M. Wiberg, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Phyllis Warren, and Aileen Bhandari, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a bench trial, defendant, Miguel Martinez, was convicted of predatory criminal sexual assault and aggravated criminal sexual abuse and was sentenced to 50 years' imprisonment. On appeal, defendant seeks reversal of his convictions and the sentence imposed thereon, arguing that his trial was conducted in contravention of his constitutional right to be present for all critical phases of his trial as well as in violation of his rights to confrontation and a public trial. For the reasons explained herein, we affirm the judgment of the circuit court.

## I. BACKGROUND

¶ 2

¶ 3    Defendant was charged with multiple sex offenses including predatory criminal sexual assault and aggravated criminal sexual abuse based on evidence that he engaged in inappropriate sexual contact with his eight-year-old minor daughter, B.M.

¶ 4    Prior to trial, the State sought leave to permit B.M. to testify via a closed-circuit television at the upcoming trial. The State's request was made pursuant to the recommendation of Illinois Department of Child and Family Services (DCFS) personnel who believed that it would be psychologically damaging to B.M. to require her to testify against her father in his presence. The circuit court presided over a hearing on the matter and heard testimony from a clinical psychologist treating B.M. who opined that that it would be detrimental to B.M.'s mental health if she were required to confront her father in person and that testimony via closed-circuit television would provide B.M. with "some semblance of safety." Defense counsel, in turn, acknowledged that he did not object to the State's request to permit B.M. to testify via closed-circuit television "as long as [defendant's] rights [we]re protected" during the upcoming trial. Ultimately, after considering the testimony of B.M.'s psychologist and the positions of the parties, the court granted the State's motion. In doing so, the court expressly found that allowing "closed circuit questioning of the complaining witness" would protect defendant's rights. Thereafter, defendant waived his right to a jury trial, electing instead to proceed by way of a bench trial.

¶ 5    Prior to opening statements, the assistant state's attorney (ASA) prosecuting the case informed the court, defendant, and defense counsel how the closed-circuit television system had been set up in anticipation of B.M.'s testimony. The ASA explained that television screen had been set up in a nearby room where defendant could sit and hear his daughter's testimony while she testified in the courtroom. The room was also equipped with an "intercom phone" that would allow defendant the opportunity to communicate in real time with his attorney. When asked if the set up was "satisfactory," defense counsel responded "yes." Defendant also acknowledged that he understood the procedure. The court then suggested that defendant relocate to the other room during oral arguments to ensure that the system was in proper working order prior to B.M.'s testimony. After opening arguments concluded, defense counsel went to speak to defendant, who reported that he had been unable to hear the opening statements. The sheriff's deputy who remained in the room with defendant during opening statements confirmed that the statements had been inaudible. The ASA increased the volume of the microphone, and defense counsel indicated that would he stand closer to the microphone when he cross-examined B.M. Thereafter, the sheriff's deputy indicated that he could hear

defense counsel "just fine." Accordingly, the State requested the court to clear the courtroom of all nonessential court personnel, and B.M. was then called upon to testify.

¶ 6       B.M., who was 13 years old and in the care of a foster family at the time of trial, detailed the sexual abuse she suffered at the hands of defendant from January 2011 to November 2012. When the abuse started, B.M. was eight years old, and she was living in an apartment with her two sisters, three brothers, defendant, and her mother. At the apartment, her three brothers shared a room and her mother slept in another room with B.M.'s two sisters. B.M., in turn, shared a room with defendant. She explained that her father would sleep on the bed while she slept on a cushion on the floor. There were certain times, however, that defendant "call[ed]" her to the bed.

¶ 7       B.M. testified that defendant first abused her when her mom was shopping with B.M.'s three brothers and one of her sisters. B.M. and her youngest sister, who was a baby at the time, were left behind with defendant. B.M. explained that she had been unable to accompany her mother shopping because she had not been able to find her shoes. While her mother and siblings were out shopping, defendant called B.M. to the bed and showed her an "inappropriate" video. The adults in the video were naked and "doing things" to each other. Defendant taught her that her "private area" was called a "pussy" and referred to her chest area as "boobs." He also taught her that his penis was called a "dick."

¶ 8       B.M. testified that on the occasions in which she was called to the bed with defendant, he touched her "pussy" with his "dick." Neither of them would be wearing underwear. Defendant also attempted to put his "dick" in her "pussy," which B.M. found to be "uncomfortable." She also found it "uncomfortable" when defendant tried to put his finger in her "pussy." B.M. testified that defendant made her touch his "dick" with her mouth and ordered her to "suck it." Defendant also touched her boobs with his hands and his mouth. He instructed her "not to tell anybody" about their interactions. B.M. explained that she followed defendant's instructions because he was her father. The abuse stopped when she was examined by a doctor and removed from the care of her parents.

¶ 9       On cross-examination, B.M. testified that, although she knew defendant first abused her when she was eight years old, she did not remember specific details about the time of the year or day of the week that the first incidence of abuse occurred. She testified that defendant used his "flip phone" to show her the inappropriate video. After that, he tried to put his "dick" and his finger in her "pussy" but was unsuccessful. B.M. also admitted she did not recall how much time passed before defendant abused her again. She did recall that the second time occurred after defendant showed her another inappropriate video on the television that was in the family room. Nobody else was home, and she did not tell her mother, siblings, or teacher what had occurred. She did not recall how many times defendant touched her inappropriately but testified that the abuse occurred on more than those two occasions. B.M. further testified that she was unaware that there were problems in her parents' marriage, and she did not know why she slept in defendant's room while her mother slept in another room with her sisters.

¶ 10       Dolly Martinez (Martinez), B.M.'s biological mother and defendant's ex-wife, admitted that she pled guilty to permitting the sexual abuse of a minor in connection with the events that occurred between B.M. and defendant. She also acknowledged that none of her six biological children were currently in her custody and care. Back in 2012, however, she was residing in a Cicero apartment with her six children and defendant. Martinez confirmed that she and defendant had slept in different rooms in the apartment. She slept in a room with two of her

daughters and her youngest son. Although she invited B.M. to sleep with her, B.M. told her that she would "rather" sleep with defendant in his room. Martinez testified that she first became aware of B.M.'s abuse on November 4, 2012, when she arrived home to the apartment and opened defendant's bedroom door. When she did so, she observed defendant on the bed with B.M. Defendant was lying on top of B.M. Neither of them was wearing clothes. Martinez became mad and scared when she saw defendant having sex with their daughter. Martinez testified that she attempted to speak to defendant and B.M. later that day about what she had observed; however, defendant "just ignored" her and B.M. "would not open up to" her. She did not let B.M. sleep in defendant's room after that day. Martinez acknowledged, however, that she did not immediately contact police about what she had seen and that she had not taken her daughter to the hospital to be examined. Instead, she took B.M. to her mother's house.

¶ 11    Although Martinez admitted that she spoke to detectives and an ASA about the November 4, 2012, incident and provided them with a signed statement on November 11, 2012, she did not remember telling them that she had prior knowledge of defendant's inappropriate sexual behavior with their daughter before she observed them in bed together. Specifically, Martinez did not recall telling the authorities that she had a conversation with B.M. "about a month" earlier during which B.M. reported that she did not want to be around defendant because he was "hurting" her and "always trying" to put his "dick" and finger in her. Martinez acknowledged that defendant owned a "flip phone" that had been provided to him through a government program but testified that it was not capable of playing videos. He also owned another cellular phone, but she did not know if it could play videos. Martinez did recall observing images of defendant and B.M. on one of his phones but denied she observed anything sexually explicit. She admitted, however, that defendant deleted the pictures on his phone after she told him that she had looked at them. When asked to describe the pictures she did observe on defendant's phone, Martinez testified that she saw a picture of B.M. with her "eyes up in the air"; however, she denied that she told detectives that she observed a picture of B.M. with defendant's penis in her mouth.

¶ 12    On cross-examination, Martinez testified that she only observed one instance of sexual contact between defendant and B.M. and that her daughter had not told her about any other incidents.

¶ 13    Jennifer Dobinson, a registered nurse employed by MacNeal Hospital, testified that she was working in the emergency room on November 10, 2012, when she encountered B.M., who was brought to the hospital by her mother and grandmother at the request of DCFS at approximately 12:24 p.m. Dobinson and Dr. Diana Goodwine interviewed B.M. in a "private location" in the hospital's emergency department. Based on the information that B.M. relayed during the interview, Dobinson and Dr. Goodwine escorted B.M. to a private patient room and administered a sexual assault kit, which involved a full body examination and DNA collection. After conducting a full body examination and observing no visible signs of physical injury, Dobinson collected B.M.'s underwear, placed it into a bag, which she then sealed. Dobinson then took an oral swab and a blood sample from B.M. Because B.M. was eight years old and a preadolescent, the doctor did not perform a speculum examination of her vaginal area; instead, in accordance with protocol, Dr. Goodwine performed a "blind sweep" of B.M.'s vaginal area with a sterile Q-tip. Dobinson testified that all of the evidence that was collected during B.M.'s examination was put into separate bags, which were then individually sealed and put into the rape kit. The rape kit was also then sealed and was subsequently turned over

- 4 -

to Cicero police officer Edgar Vera. B.M.'s family did not consent to any pictures being taken of her for evidentiary purposes.

¶ 14    When asked additional details about her encounter with B.M., Dobinson testified that when she presented at the emergency room, B.M. "did not appear to be female." She explained that B.M.'s "hair was short, almost like in a boy haircut. She was not in female-looking clothing. She almost looked like she was a boy." During the interview, B.M. relayed that she had taken a bath and had urinated and defecated before arriving at the emergency room. Six days had passed from the date of B.M.'s last sexual assault to the time that she was brought to the emergency room.

¶ 15    Dr. Goodwine confirmed that she and nurse Dobinson interviewed and examined B.M. on November 10, 2012, at MacNeal Hospital. B.M. relayed that she had been penetrated vaginally on Sunday and that her father had tried to rape her, but he was unsuccessful. B.M. further relayed that the abuse had been occurring since 2011 and that she had been "too ashamed" to tell anybody. B.M. stated that defendant placed his finger inside her, "kissed her down there" and put his penis in her on "multiple occasions." In addition, defendant also made B.M. kiss his private part and his mouth. During the interview, B.M. denied that defendant engaged in similar conduct with any of her siblings. During the physical examination that followed, Dr. Goodwine observed an abnormality in B.M.'s genitourinary area. Specifically, she observed a small red bump on B.M.'s internal labia, which is not something she normally observed in an eight-year-old child. In addition, B.M.'s hymen was partially torn and there was a superficial tear and abrasions around her vaginal opening. Although such findings were consistent with the activities described by B.M. during her interview, Dr. Goodwine acknowledged that other activities could cause those abnormalities, including a biking accident or a fall from a horse.

¶ 16    On cross-examination, Dr. Goodwine acknowledged that it was not entirely abnormal for an eight-year-old girl to have a tear in her hymen. She further acknowledged that the small red bump, like the one that she observed on B.M.'s labia, was not necessary caused by sexual trauma.

¶ 17    Officer Robert DeCianni, a detective with the Cicero Police Department, testified that he and his partner, Detective Juan Soto were assigned to collect a biological sample from defendant on November 12, 2012. After obtaining defendant's written consent authorizing the collection, Detective DeCianni used two swabs to collect DNA from the side and back of defendant's mouth, placed the swabs into bags, and sealed them. Detective DeCianni then sent the swabs to the Illinois State Police crime lab to be tested.

¶ 18    Detective DeCianni's partner, Soto, confirmed that they were assigned to investigate B.M.'s sexual assault and interviewed defendant during the course of their investigation on November 12, 2012, at the Cicero Police Department. Detective DeCianni advised defendant of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and obtained a signed and initialed form from defendant waiving those rights. Thereafter, the officers asked defendant a series of questions. Defendant's responses to those questions were reduced to a typewritten statement, which defendant then signed.

¶ 19    In his statement, defendant admitted that he "rubbed [B.M.'s] vagina with his hands on three occasions" and that she was not wearing any underwear when he did so. Defendant further admitted that he "ma[d]e [B.M.] kiss his penis on two or three occasions." Defendant also admitted that he used his phone to take two pictures of B.M. kissing his penis. Defendant, however, denied that he ever had sexual intercourse with B.M. He also denied that he ever

kissed B.M.'s vagina or her nipples. His sexual encounters with his daughter occurred between October 22, 2012, and October 31, 2012. Although defendant did not know why he engaged in sexual contact with B.M., he classified himself as a "very horny guy" and admitted that he "made a huge mistake." Defendant denied that he engaged in inappropriate sexual contact with any of his other children.

¶ 20    On cross-examination, Detective Soto admitted that defendant's interview was not video recorded. He also admitted that no inappropriate pictures of B.M. were recovered from defendant's phone but explained that defendant admitted that he had deleted the images.

¶ 21    Tom Plach testified that, in 2012, he was a licensed clinical social worker employed by Presence Behavioral Health at the Proviso Children's Advocacy Center. On November 11, 2012, he conducted a forensic victim sensitive interview (VSI) with B.M., which he described as an "information gathering" mechanism employed during a sexual assault investigation. The VSI took place in a room outfitted with electronic recording equipment and a one-way mirror. Before engaging in substantive conversation, Plach ensured that B.M. knew the difference between the truth and a lie and explained that it was okay if she did not know the answer to any of his questions. During his interview with B.M., which was recorded, Plach used diagrams that depicted anatomically correct "boy" and "girl" figures. B.M. drew circles on certain parts of the diagrams during the interview when describing her interactions with defendant. After Plach confirmed that the recording of his interview with B.M. accurately depicted his conversation with her, the court stated that it would watch the video in chambers.

¶ 22    ASA Sarah Karr testified that she was assigned to observe Plach's forensic interview with B.M. on November 11, 2012. After doing so, she relocated to the Cicero Police Department, where she took a written statement from Martinez, B.M.'s mother. Detective Soto was also present for the statement. In the statement, Martinez admitted she discovered three sexually explicit photographs of B.M. on defendant's phone. In the pictures, defendant's penis was in B.M.'s mouth and B.M. appeared to be "upset" in the photographs. When Martinez confronted defendant about the pictures and asked him "why he was doing that with his daughter," he took the phone and deleted the pictures. Karr testified that she returned to the Cicero Police Department the following day and interviewed defendant. Detective Soto was also present for that interview as well. After he was advised of and waived his *Miranda* rights, defendant provided a statement in which he admitted to engaging in sexual contact with B.M. Specifically, he admitted that on more than one occasion, he removed B.M.'s pajama bottoms and touched her vagina with his hands; however, he denied that he inserted his fingers into her vagina. Defendant also admitted that he had B.M. kiss his penis on two occasions. On both occasions, B.M. kissed his penis with a closed mouth. Defendant further admitted that he used his phone to take two pictures of B.M. kissing his penis. He claimed he did so because B.M. was "curious." He then showed the pictures to B.M. She was the only person to whom he showed the photographs. Defendant did not know when Martinez saw the pictures. He denied that his wife observed him and B.M. naked and in bed together on November 4, 2012. Defendant described himself as a "very horny guy" and stated that Martinez had stopped engaging in sexual intercourse with him two years ago. Defendant's statement was reduced to writing, and he signed the statement, thereby acknowledging that the details included therein were accurate. Karr acknowledged that she did not use audio or video equipment to record her interview with defendant.

¶ 23    Kenan Hasanbegovic, a forensic scientist with the Illinois State Police crime lab and an expert in the field of forensic biological analysis, testified that he conducted testing on the evidence included in B.M.'s rape kit, which he received in a sealed condition. He first conducted testing on B.M.'s underwear, which contained several bodily fluid stains. One of those stains tested positive for the presence of semen and was preserved for DNA analysis. Hasanbegovic acknowledged he did not know when or how the sperm cells appeared on the underwear that he examined.

¶ 24    Megan Neff, a forensic scientist with the Illinois State Police and an expert in the field of forensic DNA analysis, testified that she performed testing on the samples collected in connection with the case. She first generated DNA profiles from the preserved buccal swab standards that were collected from defendant and B.M. She then conducted testing on the semen stain that was present on B.M.'s underwear. Neff testified that the underwear contained a DNA mixture from two people, one of whom was male. The male DNA profile that she discovered "match[ed]" defendant's DNA profile. She explained that the male profile that she identified would be expected to occur in approximately 1 in 97 quintillion African Americans, 1 in 2.6 quintillion whites, and 1 in 6.2 quintillion Hispanic unrelated individuals.

¶ 25    After presenting the aforementioned evidence, the State rested its case. Defendant's motion for a directed finding was denied, and defendant elected to testify. When asked by his attorney if he ever touched B.M. "inappropriately," defendant testified, "Not really. I never did." He then specifically denied that he ever touched his daughter's vagina or chest. He also denied that he ever had his daughter touch his penis. Although he acknowledged that he owned a cell phone, defendant testified that the phone did not have Internet access and that he never had pornography or inappropriate pictures of B.M. on his phone. He also denied that he ever showed his daughter pornography. Defendant admitted that he and Martinez had relationship "problems" in 2011 and 2012 and that he knew she wanted to leave him. Defendant also admitted that he signed a statement at the Cicero Police Department; however, he testified that he only did so because the officers told him he could leave once he signed the document. He classified the officers' actions as a "setup" and testified that he "never" told the officers that he ever touched his daughter in an inappropriate sexual manner. Defendant denied that he was ever provided with his *Miranda* rights and testified that he never read the statement that he signed. Defendant also testified that the underwear with the semen stain that the State introduced into evidence belonged to Martinez, not his daughter.

¶ 26    Following defendant's testimony, the defense rested. The parties then delivered closing arguments. After considering the evidence and the arguments of the parties, the court found defendant guilty of multiple counts of predatory criminal sexual assault, criminal sexual assault, and aggravated criminal sexual abuse. In doing so, the court found that B.M. "was a much more credible witness than her father." Moreover, the court noted that B.M.'s testimony at trial and during her VSI was corroborated by the physical evidence detailed by Dr. Goodwine as well as by defendant's own statement. In contrast, found defendant's testimony "totally incredible" and noted that his claim that that the underwear that was introduced at trial belonged to Martinez was refuted by the DNA evidence. Moreover, the fact that defendant's semen was found on that underwear that he claimed belonged to Martinez was inconsistent with his testimony that they had not had intercourse in two years.

¶ 27    Defendant's posttrial motion was denied, and the cause proceeded to a sentencing hearing, where the court, after considering the evidence presented in aggravation and mitigation,

sentenced defendant to a total of 50 years' imprisonment. This appeal followed.

¶ 28                                    II. ANALYSIS
¶ 29                    A. Defendant's Absence During Opening Statements
¶ 30        On appeal, defendant argues that his trial was conducted in contravention of a number of his constitutional rights. He first argues that he was denied his constitutional right to be present for all critical stages of his trial when he was absent from the courtroom during opening statements. Although he was taken to another room to listen to and observe the statements, the audio equipment was not calibrated properly, and he was unable to hear those statements.

¶ 31        The State, in turn, responds that defendant waived his right to be present when he agreed to view the opening statements via closed-circuit television and, as such, may not avail himself of the plain error doctrine. Alternatively, the State observes that defendant failed to raise this issue in a posttrial motion and submits that he is not entitled to relief under the plain error doctrine because "his physical absence in the courtroom did not result in an unfair trial or a violation of an underlying substantial right."

¶ 32        As a threshold matter, defendant acknowledges that he failed to properly preserve his claims that his trial was conducted in contravention of his constitutional rights. Specifically, he failed to object to each of the purported constitutional violations at trial and failed to include them in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (recognizing that to properly preserve an issue for appeal, a defendant must object to the purported error at trial and specify the error in a posttrial motion and that his failure to satisfy both requirements results in forfeiture of appellate review of his claim). In an effort to avoid forfeiture, however, defendant invokes the plain error doctrine, which provides a limited exception to the forfeiture rule and allows for review of forfeited issues on appeal if the evidence is closely balanced or the error is of such a serious magnitude that it affected the integrity of the judicial process and deprived the defendant of his right to a fair trial. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Belknap*, 2014 IL 117094, ¶ 48; *People v. Sargent*, 239 Ill. 2d 166, 189 (2010); *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007).

¶ 33        The plain error doctrine, however, only applies to claims that are forfeited, not waived. *People v. Schoonover*, 2019 IL App (4th) 160882, ¶ 15. Although sometimes mistakenly used interchangeably, the doctrines of waiver and forfeiture are distinct. *People v. Sophanavong*, 2020 IL 124337, ¶ 20. Waiver differs from forfeiture in that waiver " 'is an intentional relinquishment or abandonment of a known right or privilege' " whereas forfeiture is the " 'failure to make the timely assertion of [a] right' " or privilege. *Id.* (quoting *People v. Lesley*, 2018 IL 122100, ¶¶ 36-37). When constitutional rights are implicated, waivers " 'not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.' " *People v. Johnson*, 75 Ill. 2d 180, 187 (1979) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). Unlike waiver, "[f]orfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right." *Lesley*, 2018 IL 122100, ¶ 37.

¶ 34        In this case, prior to trial, the court held that B.M. would be permitted to testify via closed-circuit television. In accordance with the court's prior ruling, a television was set up in a room close to the courtroom where defendant could observe his daughter's testimony. The room was also equipped with an intercom phone that defendant could use to communicate with his attorney during his daughter's testimony. The setup was explained to defendant and defense

counsel immediately before the trial began. When the court inquired whether the setup was "satisfactory," defense counsel responded, "yes." The court then addressed defendant to assess whether he understood the process by which he would be viewing his daughter's testimony, and he responded, "yes." Thereafter, to ensure that the equipment was in proper working order, the trial court suggested that defendant observe opening statements from that room. Neither defendant nor his attorney voiced any objection to the court's suggestion, and defendant left the courtroom to listen to and observe opening statements via the closed-circuit television system. After opening statements concluded, the court and the attorneys were informed that defendant had been unable to hear the statements. The lack of audio was also corroborated by the sheriff's deputy who was monitoring defendant. Accordingly, the parties examined the audio equipment and adjusted the microphone settings, and defense counsel indicated he would stand closer to the microphone when he spoke in the courtroom.

¶ 35    Based on these facts, we do not find that defendant waived his claim pertaining to his absence during opening statements. Although defendant apparently willingly exited the courtroom to listen to, and view, opening statements, he was never specifically advised of his constitutional right to be present. Moreover, there is no dispute that he was unable to hear those statements due to problems with the audio portion of the closed-circuit television system. His apparent willingness to absent himself from the courtroom during oral arguments was based upon an implied understanding that he would actually be able to see and hear those arguments. That, however, did not occur. Mindful that the principles of waiver should be liberally construed in favor of a defendant (*People v. Phipps*, 238 Ill. 2d 54, 62 (2010)), we do not find that the record supports a finding that defendant knowingly and voluntarily waived his right to be physically present for opening statements. See, *e.g.*, *People v. Stroud*, 208 Ill. 2d 398, 403, 409 (2004) (declining to find that the defendant waived his right to be present for plea proceedings where he was not specifically informed of his right to be present and thus "did not specifically waive his right to be bodily in the courtroom"). Accordingly, we will review his claim for plain error. The first step in any plain error analysis is to determine whether any error actually occurred. *Piatkowski*, 225 Ill. 2d at 565; *People v. Rinehart*, 2012 IL 111719, ¶ 15. If an error is discovered, defendant then bears the burden of persuasion to show that the error prejudiced him. *Sargent*, 239 Ill. 2d at 189-90. Keeping this standard in mind, we turn now to evaluate the merit of defendant's claim.

¶ 36    The federal and Illinois state constitutions both "afford criminal defendants the general right to be present, not only at trial, but at all critical stages of the proceedings, from arraignment to sentencing." *People v. Lindsey*, 201 Ill. 2d 45, 55 (2002). A defendant's right to be present, however, is not considered to be a substantial constitutional right; rather, it is a " 'lesser right' that is intended to secure the substantial rights of a defendant, such as the right to confront witnesses, the right to present a defense, or the right to an impartial jury." *People v. Johnson*, 238 Ill. 2d 478, 487 (2010). In addition to being a lesser right, a defendant's right to be present is not absolute. *Lindsey*, 201 Ill. 2d at 56; *People v. Lucas*, 2019 IL App (1st) 160501, ¶ 12. " '[The] privilege of presence is not guaranteed "when presence would be useless, or the benefit but a shadow" ' "; however, " 'due process clearly requires that a defendant be allowed to be present "to the extent a fair and just hearing would be thwarted by his absence." ' " *Lindsey*, 201 Ill. 2d at 56-57 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). Moreover, a defendant can waive his right to be present by consenting to be absent for a portion of a proceeding or through his own misconduct. *Id.* at 56. Accordingly, "even

where a defendant has the general right to be present because the proceeding is a 'critical' stage, a defendant's absence is not a *per se* constitutional violation." *Id.* at 57. Instead, the defendant's right to be present will be found to be violated "only if the record demonstrates that defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right." *Id.*; see also *People v. Hood*, 2016 IL 118581, ¶ 31 (categorizing the right to be present as a " 'lesser right,' meaning that the right is violated only when the defendant's absence results in the loss of an underlying substantial right or in an unfair proceeding"). Whether a defendant's absence affected the fairness of his trial depends on a review of the record as a whole and depends upon the specific nature of the proceeding from which he was absent. *Lucas*, 2019 IL App (1st) 160501, ¶ 13.

¶ 37    In this case, although we do not condone the procedure by which the court and the parties tested the closed-circuit television system, which resulted in defendant being unable to hear the parties' opening statements, we do not find that defendant's absence from the courtroom during opening statements and his inability to hear those statements resulted in an unfair trial or the denial of an underlying substantial right. While defendant suggests that his inability to hear the State "announce its chosen theory of the case" during opening statements resulted in him being "deprived of necessary information to allow him to intelligently exercise his right to testify, or to refrain from testifying, on his own behalf," we cannot agree. It is true that a defendant should be made aware of "*all* of the State's evidence" when exercising his right to decide whether or not to testify on his own behalf. (Emphasis in original.) *Id.* ¶ 19. Opening statements, however, are not evidence (*People v. Jaimes*, 2014 IL App (2d) 121368, ¶ 56); rather, opening statements serve to outline the *expected* evidence and the reasonable inferences that may be drawn from that evidence (*People v. Arroyo*, 339 Ill. App. 3d 137, 149 (2003)). Here, there is no dispute that defendant heard all of the State's evidence against him prior to exercising his right to testify. That is, defendant made his decision to testify after hearing testimony from his daughter, his ex-wife, medical personnel, forensic scientists, and police detectives. As such, his absence from the courtroom during opening statements and his inability to hear those statements did not prevent him from making a fully informed decision as to whether or not to testify. Because defendant's absence from the courtroom during opening statements did not result in an unfair trial or result in the denial of an underlying substantial right, we find no constitutional violation. See, *e.g.*, *Lindsey*, 201 Ill. 2d at 60 (finding the defendant's absence during his arraignment and jury waiver did not amount to a constitutional violation where it did not cause the proceedings to be unfair or result in a denial of an underlying constitutional right). Having found no error, there can be no plain error. *Hood*, 2016 IL 118581, ¶ 18.

¶ 38    B. Defendant's Absence From the Courtroom During B.M.'s Testimony

¶ 39    In a related claim, defendant next challenges the procedure by which the court permitted B.M. to testify. Although he acknowledges that section 106B-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/106B-5 (West 2012)) provides a mechanism by which minor victims of sexual assault may testify via closed-circuit television, he argues that the circuit court failed to follow the procedure outlined in the statute. Defendant submits that the court's failure to abide by the statute resulted in the denial of his right to be present at every critical stage of his trial, "which in turn infringed on his underlying substantial rights to confrontation and the assistance of counsel."

- 10 -

¶ 40    The State again argues that defendant waived his claim because he acquiesced to the manner in which B.M. was permitted to testify, which resulted in his exclusion from the courtroom. On the merits, the State contends that defendant's "viewing of B.M.'s testimony via closed-circuit television did not violate his right to be present, nor infringe on his underlying substantial rights to confrontation and the assistance of counsel."

¶ 41    Having already discussed the relevant law concerning a criminal defendant's right to be present for all critical stages of his trial, we will now set forth the relevant law concerning a defendant's right to confrontation, which is provided for in both the federal and Illinois state constitutions. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8 (amended 1994). "The central concern of the confrontation clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *People v. Lofton*, 194 Ill. 2d 40, 56 (2000). The constitutional right to confrontation includes the right to hear and view a witness as he or she testifies and to aid in counsel's cross-examination of that witness. *Id.* at 60; see also *Hood*, 2016 IL 118581, ¶ 19 ("The confrontation clause 'provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination' " (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) (opinion of Powell, J., joined by Rehnquist, C.J., and White and O'Connor, JJ.))). Although the constitutional right to confrontation includes a preference for face-to-face confrontation, testimony delivered through electronic means does not necessarily result in a violation of a defendant's constitutional right. See *Maryland v. Craig*, 497 U.S. 836, 851-52 (1990) (holding that the "use of the one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause"); see also *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005) (recognizing that "[w]hile the confrontation clause represents a preference for face-to-face confrontation, that preference 'must occasionally give way to considerations of public policy and the necessities of the case' " (internal quotation marks omitted)).

¶ 42    In Illinois, section 106B-5 of the Code, provides a mechanism through which minor victims of sex crimes can testify electronically outside of the immediate physical presence of a criminal defendant. Specifically, the statute provides as follows:

"(a) In a proceeding in the prosecution of [certain enumerated sex offenses], a court may order that the testimony of a victim who is a child under the age of 18 years *** be taken outside the courtroom and shown in the courtroom by means of a closed circuit television if:

(1) the testimony is taken during the proceeding; and

(2) the judge determines that testimony by the child victim *** in the courtroom will result in the child *** suffering serious emotional distress ***.

* * *

(f) The defendant shall be allowed to communicate with the persons in the room where the child *** is testifying by any appropriate electronic method." 725 ILCS 5/106B-5 (West 2012).

¶ 43    Initially, we note that defendant does not contest the propriety of the court's ruling allowing B.M. to testify via closed-circuit television to prevent her from experience adverse psychological effects if forced to confront him in person; rather, he simply challenges the

- 11 -

manner in which B.M.'s closed-circuit television testimony took place. We agree with defendant that the specific procedure outlined in section 106B-5 was not followed. As explained above, the statute permits a minor to testify "outside the courtroom and" have his or her testimony "shown in the courtroom by means of a closed[-]circuit television." *Id.* § 106B-5(a). In this case, however, B.M. testified in the courtroom and defendant was relocated to a nearby room to view her testimony via closed-circuit television.

¶ 44    Although the procedure outlined in section 106B-5 was not adhered to, the State argues that defendant and defense counsel were aware of, and agreed to, the manner in which the closed-circuit television system was set up. Indeed, the record reveals that, prior to trial, the ASA explained the setup and offered to have the court and defense counsel inspect it. The court then asked defense counsel whether the setup was "satisfactory," and defense counsel, responded, "Yes, your Honor." The court next addressed defendant and asked whether he understood the procedure, and defendant responded, "Sure." The court went on to explain, "[F]or at least one witness, you will be in the back. All other witnesses, we'll have you out here. Okay?" Defendant, in turn, responded, "Sure." He then left the courtroom to view B.M.'s testimony from the other room. Based on these facts, the State argues that that defendant waived rather than forfeited his challenge to the manner in which the closed-circuit television system was employed in this case. That is, by failing to raise any objection and voluntarily leaving the courtroom will full knowledge of the manner in which he would be observing B.M.'s testimony, the State argues that defendant knowingly and voluntarily waived his right to be present in court for her testimony. We disagree. Although the record clearly demonstrates that defendant was aware of the process through which B.M. would be testifying and raised no objection, he was never specifically advised of his constitutional right to be present. We reiterate that the principles of waiver should be liberally construed in favor of a defendant (*Phipps*, 238 Ill. 2d at 62) and conclude that the record does not support a finding that defendant knowingly and voluntarily waived his right to be physically present for B.M.'s testimony. See, *e.g.*, *People v. Salgado*, 2012 IL App (2d) 100945, ¶ 17 (finding that the defendant did not waive his right to be physically present during the minor victim's testimony where "nothing in the record shows that defendant understood that he had a right to be present").

¶ 45    Having found that defendant forfeited rather than waived his claim, we still nonetheless conclude that he is not entitled to any relief under the plain error doctrine because he is unable to show that his absence from the courtroom resulted in an unfair proceeding or caused him to be denied an underlying substantial constitutional right. Although defendant argues that his absence from the courtroom during B.M.'s testimony infringed on his constitutional right to confrontation and to assist in his own defense, courts have held that a defendant's constitutional right to confrontation is not violated when the defendant is permitted to cross-examine the child who is testifying via closed circuit television in accordance with the protections afforded by section 106B-5 of the Code. See, *e.g.*, *Lofton*, 194 Ill. 2d at 59-60 (recognizing that a statutory scheme that permits a child victim to testify via closed-circuit television does not violate a defendant's right to confrontation where the child testifies under oath and under the " 'watchful eyes of the parties and the fact finder' " and is subject to contemporaneous cross-examination (quoting *People v. Van Brocklin*, 293 Ill. App. 3d 156, 169 (1997))); *People v. Pope*, 2020 IL App (4th) 180773, ¶ 38 (holding that "[a] defendant's confrontation clause rights are not violated when the defendant is allowed to cross-examine the witnesses testifying pursuant to section 106B-5").

¶ 46    Here, there is no dispute that B.M. testified under oath under the watchful eyes of the parties and the fact-finder and was subject to contemporaneous cross-examination. Unlike the problems that arose during opening statements, there is no evidence in the record that defendant was unable to see or hear B.M.'s testimony. Although defendant suggests that there is no evidence that the intercom phone that was available to him to converse with his attorney and assist in counsel's cross-examination of his daughter was "even operable," we emphasize that there is nothing in the record to suggest that the intercom system was *not* in proper working order. See *In re Linda B.*, 2017 IL 119392, ¶ 43 (noting that "on appeal, the party claiming error has the burden of showing any irregularities that would justify reversal" and that "[e]rror is never presumed by a reviewing court; it must be affirmatively shown by the record"). Defendant, however, also suggests that the fact that there was a sheriff's deputy in the room where he watched B.M.'s testimony further impaired his ability to communicate with counsel and assist in his defense. We note, however, that even if defendant had been in the courtroom during B.M.'s testimony, other people would have also been located in close proximity to him if and when he conferred with counsel, including the ASA prosecuting the case and the sheriff's deputy in charge of securing the courtroom. In either instance, defendant would be required to speak quietly to avoid being overheard. Ultimately, based on the record, there is no evidence that defendant's absence from the courtroom significantly impaired his right to communicate with counsel and assist in his own defense or violated his constitutional confrontation rights. See, *e.g.*, *Lindsey*, 201 Ill. 2d at 60 (recognizing that while the use of a closed-circuit system affected the defendant's ability to confer privately with counsel, the record did not support a finding that the defendant was denied adequate representation due to his absence from the courtroom). Indeed, there is no evidence that defendant's absence from the courtroom during B.M.'s testimony resulted in an unfair proceeding or resulted in the denial of an underlying substantial right. Accordingly, we find no constitutional violation. See *id.* Absent a violation, there is no plain error. *Hood*, 2016 IL 118581, ¶ 18.

¶ 47    C. Exclusion of Other Individuals From the Courtroom During B.M.'s Testimony

¶ 48    Defendant next argues that he was denied his right to a public trial when the court excluded members of the public from the courtroom during B.M.'s testimony pursuant to section 115-11 of the Code (725 ILCS 5/115-11 (West 2012)).

¶ 49    The State again responds that defendant waived review of his claim because he did not object to the court's decision to exclude certain individuals from the courtroom during B.M.'s testimony. On the merits, the State submits that the partial closing of the courtroom did not violate defendant's constitutional right to a public trial.

¶ 50    As a threshold matter, we note that there is no dispute that defendant failed to object to the exclusion of several individuals from the courtroom during B.M.'s testimony. We decline, however, the State's invitation to equate defendant's failure to object as an affirmative acquiescence and waiver of his right to a public trial. See *Sophanavong*, 2020 IL 124337, ¶ 20 (explaining that waiver " 'is an *intentional* relinquishment or abandonment of a known right or privilege' " whereas forfeiture is the " 'failure to make the timely assertion of [a] right' " or privilege (emphasis added) (quoting *Lesley*, 2018 IL 122100, ¶¶ 36-37)). Accordingly, we will review his claim for plain error.

¶ 51    Criminal defendants are afforded a constitutional right to a public trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8 (amended 1994). The right to a public trial

- 13 -

encompasses the right to publicly present evidence and witnesses. *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 37. This right, which exposes the legal process, is designed primarily to protect the accused (*id.* ¶ 32), but it also serves to protect interests that do not belong solely to a defendant, including the general public and the press (*People v. Radford*, 2020 IL 123975, ¶ 25). For example, the "[o]penness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system." *Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979).

¶ 52        Section 115-11 of the Code allows for the "limited" exclusion of witnesses during the testimony of a minor victim of certain sex offenses (*People v. Williams*, 2016 IL App (3d) 130901, ¶ 19) and provides as follows:

> "In a prosecution for [certain sex offenses, including predatory sexual assault of a child], where the alleged victim of the offense is a minor under 18 years of age, the court may exclude from the proceedings while the victim is testifying, all persons, who, in the opinion of the court, do not have a direct interest in the case, except the media." 725 ILCS 5/115-11 (West 2012).

¶ 53        The plain language of the statute places three conditions on a partial courtroom closure during a minor victim's testimony: (1) the trial court cannot exclude the media, (2) the trial court may only exclude persons who do not have a direct interest in the case, and (3) the exclusion of individuals without a direct interest in the case cannot extend beyond the minor victim's testimony. *Schoonover*, 2019 IL App (4th) 160882, ¶ 23. Persons with a direct interest in the case include a defendant's immediate family. See *People v. Falaster*, 173 Ill. 2d 220, 228 (1996). Courts have held that a defendant's right to a public trial is not violated when the circuit court adheres to the narrow exclusionary powers outlined in the statute. *Id.*; see also *Schoonover*, 2019 IL App (4th) 160882, ¶ 43 ("an order by the trial court excluding spectators from the proceeding is sufficient where it satisfies section 115-11 of the Code"); *Williams*, 2016 IL App (3d) 130901, ¶ 20 ("[A]n exclusionary order under section 115-11 of the Code is valid if it meets the requirements of the statute.").

¶ 54        Here, prior to B.M.'s testimony, the following discussions were had about excluding witnesses during B.M.'s testimony:

> "[ASA]: Judge, at this time, we would ask for the child's testimony, that the courtroom be cleared of everyone, non-essential court personnel, except for her therapist, the victim witness assistant from the State's Attorney's Office, and her foster family, if they choose to stay.
>
> THE COURT: Who are those people then that you're asking to stay in? Just that back row there?
>
> [ASA]: If the family chooses to stay, I guess just those four individuals back there. Or actually just the three. I don't know that—
>
> THE COURT: Why is she—off the record for a moment.
>
>           (Whereupon a discussion was had off the record.)
>
> "THE COURT: I want you two ladies to sit outside. Do you want to call your first witness?
>
> [ASA]: Yes, Judge. Coming in right now.

- 14 -

THE COURT: [B.M.], come on up. For the record, I've asked the mom's family to leave but the other person can stay."

¶ 55    Defendant argues that the ambiguity of the aforementioned exchange and the lack of clarity as to the identities of the excluded persons and whether or not they had a direct interest in the case justifies a finding that his right to a public trial was violated. We disagree. Although we acknowledge the lack of clarity in the record as to exact identities of the excluded individuals, it is evident that the court engaged in a discussion off the record, after which it directed two of the three individuals seated in the back row of the courtroom to "sit outside" during B.M.'s testimony. Those two individuals were apparently members of "the mom's family." Because B.M. was living with a foster family, the court could have either been referring to family members of B.M.'s foster mother, or family members of B.M.'s biological mother. Either way, it is clear that the individuals excluded were not members of defendant's immediate family who necessarily have a direct interest in the case. See, *e.g.*, *Falaster*, 173 Ill. 2d at 225, 228 (recognizing that persons with a direct interest in the case include a defendant's immediate family and concluding that the circuit court did not err in excluding "two nephews of the defendant and the grandfather of one of the nephews" because they were "not members of the defendant's immediate family and thus did not have a direct interest in the outcome of the case"). Indeed, defendant has not identified any person with a direct interest in the case who was improperly excluded.

¶ 56    We acknowledge that the court's decision to exclude two of the three persons seated in the back of the courtroom was made following an off the record discussion and emphasize that the better practice would undoubtably be for the trial court to make its findings on the record. Nonetheless, because the trial court is presumed to know and follow the law absent evidence to the contrary (*In re Jonathon C.B.*, 2011 IL 107750, ¶ 72), we necessarily presume that the court properly ascertained whether or not the persons seated in the courtroom had a direct interest in the case and excluded only those individuals who did not. Accordingly, because the record does not support a finding that the court violated the requirements of section 115-11 of the Code, we reject defendant's argument that he was denied his constitutional right to a public trial. See *Williams*, 2016 IL App (3d) 130901, ¶ 22 (rejecting the defendant's argument that he was denied the right to a public trial where the court conducted a discussion off the record prior to excluding certain individuals during the minor victim's testimony, reasoning: "Since trial judges are presumed to follow the law [citation], we presume that the judge allowed all those identified with a direct interest in the case to be present during [the minor-victim's] testimony. While a better practice would have been to make those findings on the record, we cannot say that the trial court abused its discretion.").

¶ 57    In so finding, we are unpersuaded by defendant's reliance on *Schoonover*, 2019 IL App (4th) 160882. In that case, the Fourth District found that the trial court violated the defendant's right to a public trial when it *sua sponte* excluded individuals from the courtroom during the minor-victim's testimony without first determining whether they had a direct interest in the case and thus failed to comply with the requirements of section 115-11 of the Code. *Id.* ¶ 26. Although defense counsel "brought the presence of defendant's 'family members' to the court's attention," the record showed that the court directed them out of the courtroom "without making any inquiry into those individuals or their interest in the case." *Id.* ¶ 29. The Fourth District concluded: "The court's failure to make any inquiry indicates that it did not make an informed decision as to whether the family members brought to its attention had a direct

- 15 -

interest in the proceedings prior to excluding them. Such action amounted to a blanket exclusion *** and constituted a violation of statutory requirements." *Id.*

¶ 58    Unlike the situation in *Schoonover*, where the record definitively showed that the circuit court failed to abide by the stringent requirements of section 115-11 of the Code prior to excluding individuals from the courtroom during the minor victim's testimony, the record in this case contains no such evidence. Therefore, we do not find that *Schoonover* compels a different result. Accordingly, we reject defendant's claim that the circuit court deprived him of his right to a public trial when it excluded certain individuals from the courtroom during B.M.'s testimony. Absent error, there is no plain error. *Hood*, 2016 IL 118581, ¶ 18.

¶ 59              D. Court's Decision to View B.M.'s VSI Video Outside of the Courtroom

¶ 60    Defendant next argues that the circuit court also violated his right to be present and his right to a public trial when it viewed the video of B.M.'s VSI outside of the courtroom and outside of the presence of him and his attorney.

¶ 61    The State again argues that defendant waived appellate review of his claim because he failed to object and through his conduct, "affirmatively acquiesced to the circuit court's viewing of the properly admitted VSI interview outside of the courtroom." On the merits, the State contends that "defendant's rights to be present and to a public trial were not implicated, much less violated where the court viewed B.M.'s properly admitted VSI video outside of the courtroom."

¶ 62    The record shows that prior to trial, the parties litigated the admissibility of the recording of B.M.'s VSI. After a hearing on the merits, the circuit court found the recording admissible. Thereafter, at trial, licensed clinical social worker Plach testified that he conducted a forensic VSI with B.M. on November 11, 2012. The VSI was recorded, and Plach confirmed that the recording accurately depicted his interview with B.M. The video was then entered into evidence. Thereafter, the following discussions were had about the video:

"[ASA]: [D]o you want me to publish the video today? That would take about 54 minutes.

THE COURT: I'm not going to sit here and watch it.

[ASA]: Okay. You'll watch it in chambers then.

THE COURT: Yes. Because, obviously this is going to be more than one court date. So, I could view the video in chambers unless, you want to put it back in front of—

[ASA]: I don't. I just wanted to take the Court's temperature on that. Then, I would ask for a ten-minute recess, Judge.

THE COURT: Okay. All right we'll take ten minutes."

¶ 63    Thereafter, at the conclusion of the first day of trial, the parties again discussed the VSI, and the court ensured that defendant would have the opportunity to view the VSI before the second day of trial resumed. The following discussion was had on the record.

"THE COURT: So we're going to stop the witness testimony today. I believe that the defendant should be able to view the VSI which is about an hour long.

[ASA]: Approximately 54 minutes.

THE COURT: Okay. And I don't care where that takes place as long as [defense counsel] is with him.

[DEFENSE COUNSEL]: And the deputy sheriff, I assume.

THE COURT: And the deputy sheriff. So they can either be here in the room or in the back room or in the back room where the TV is set up. Whatever your pleasure is. *** All I'm concerned about is that the defendant view the VSI. He has a right to view it. I don't have to be here for that. The State doesn't necessarily have to be here for that because there's no questioning that's going on. It just has to be published, and he has to view it. And I have more than enough time to view it again, even though I did view it once before in the motion, prior to the next date where we're going to have testimony."

¶ 64 The trial was then continued for several weeks. When the trial resumed, defense counsel addressed the court as follows:

"Judge, on the last court date, you wanted me to sit with my client with the Victim Sensitive Interview in the jury room. We did do that after court broke for the day; watched it all the way through with the sheriff. I just wanted to put it on the record he has seen it."

No further discussions were had on the record about the VSI until the court delivered its guilty verdict. In finding defendant guilty, the court expressly found B.M.'s trial testimony and her statements in her VSI to be credible and supported by the physical evidence.

¶ 65 Although there is no dispute that defendant did not object to court's decision to view the VSI in chambers, we again decline the State's invitation to equate a lack of objection to an affirmative acquiescence. As such, we find that defendant forfeited rather than waived his claim, and we will review his claim for plain error. See generally *Sophanavong*, 2020 IL 124337, ¶ 20.

¶ 66 Although the right to a public trial encompasses the right to publicly present evidence and witnesses, this court has held that a defendant's right to a public trial is not implicated when properly admitted evidence is viewed outside the courtroom by the trier of fact. See *Groebe*, 2019 IL App (1st) 180503. In *Groebe*, the defendant, who was on trial for DUI, challenged the circuit court's decision to view the video recording of the defendant's traffic stop and field sobriety tests in chambers during a break in the bench trial, arguing that manner in which the court viewed the video violated her constitutional right to a public trial. *Id.* ¶ 31. On review, we observed that "cases addressing a defendant's right to a public trial have largely involved the trial court's actual closure of the courtroom for some portion of the trial or the exclusion of some individuals from the courtroom" and that there were no cases finding that a defendant's right to a public trial was violated when a court viewed publicly admitted evidence privately in chambers. *Id.* ¶ 36. We emphasized that although the court did not view the video in open court, the officer who conducted the defendant's traffic stop testified in open court that he had reviewed the video of the stop and that it accurately depicted the stop and the defendant's performance of the field sobriety tests. *Id.* ¶ 37. Accordingly, we concluded that the court's viewing of the traffic stop video in chambers "did not implicate defendant's right to a public trial" (*id.* ¶ 38) because

"there was no closure of the courtroom or exclusion of the public from the courtroom. Rather, the foundation for the video of defendant's traffic stop was laid in open court, and the video was proffered into evidence in open court. The right to a public trial is not implicated where evidence is presented in open court, and that right does not extend to the viewing of exhibits by the public" (*id.* ¶ 40).

This court further found that the trial court's viewing of the traffic stop video in chambers did not violate the defendant's right to be present for all critical stages of her trial either as there was no evidence that the defendant's absence rendered the proceedings unfair or resulted in the denial of a substantial right. *Id.* ¶ 51. In so finding, we reasoned that the defendant's substantial underlying right to confrontation was not violated because the officer who conducted the traffic stop depicted in the video was subject to cross-examination in open court. *Id.* ¶¶ 51-52. In addition, there was no evidence that the court's private viewing of the video prejudiced the defendant's underlying substantial right to assist in her own defense and decide whether to testify. *Id.* ¶ 52. Accordingly, we rejected the defendant's claims of constitutional error. *Id.*

¶ 67     Here, as in *Groebe*, the video at issue was authenticated by a witness who testified in open court and the video was then admitted into evidence. Specifically, Plach, the clinical social worker who conducted B.M.'s VSI, testified in open court that he reviewed the recording and that it accurately portrayed his encounter with B.M. The court then viewed the publicly admitted video privately in chambers. Based on these facts, defendant's claim that the circuit court's private viewing of the VSI violated his constitutional right to a public trial lacks merit. See *id.* ¶ 40. Moreover, as in *Groebe*, there is no evidence that circuit court's viewing of the video privately in chambers resulted in a violation of defendant's right to be present for all critical stages of his trial, as there is no evidence that the procedure resulted in an unfair trial or the denial of an underlying substantial constitutional right. Because Plach was subject to in-court cross examination about the video, defendant's underlying substantial right to confrontation was not violated. See *id.* ¶¶ 51-52. Moreover, given that defendant viewed the VSI and was aware of the contents thereof prior to deciding to exercise his right to testify in his own defense, there is no evidence that circuit court's private viewing of the VSI video prevented him from assisting in his own defense or from making a fully informed decision to exercise his right to testify. See *id.* ¶ 52.

¶ 68     In so finding, we do not find that this court's decision in *Lucas*, 2019 IL App (1st) 160501, compels a different result. In that case, the circuit court, like the court in *Groebe*, viewed a video of the defendant's traffic stop in chambers outside of the presence of the defendant. *Id.* ¶¶ 5-6. After viewing the video in chambers outside of the defendant's presence, the court then admitted the video into evidence and expressly relied on the video to find the defendant guilty of DUI and several other offenses. *Id.* ¶¶ 6-7. On review, we found that the manner in which the circuit court viewed the video of the defendant's traffic stop amounted to a violation of her right to be present for all critical stages of the proceeding because it infringed on her underlying right to "view the evidence against her and aid in her own defense." *Id.* ¶ 14. In so finding, we emphasized that the traffic stop video "involved a significant portion of the evidence against" the defendant and that there was no "affirmative evidence" that the defendant had ever seen the video. *Id.* ¶¶ 15-16. Without viewing the video, we found that the defendant could not have made a fully informed decision whether to exercise her constitutional right to testify. *Id.* ¶¶ 19-20. Accordingly, because we concluded that the court's viewing of the video at issue outside of the defendant's presence had a "cascading impact on [her other] fundamental rights," we reversed the defendant's conviction and remanded the cause for a new trial. *Id.* ¶ 21.

¶ 69     The facts in this case differ markedly from the facts in *Lucas* because the record is clear that defendant viewed the video at issue. After Plach authenticated B.M.'s video and it was admitted into evidence, the circuit court ensured that defendant viewed the video before the

State presented any additional evidence. Defense counsel confirmed on the record that defendant had viewed the video in his presence. Unlike *Lucas*, defendant was thus aware of all the evidence against him prior to exercising his right to testify. Therefore, the court's private viewing of the video in chambers did not impact the fairness of defendant's trial or violate any of defendant's substantial constitutional rights. Having found no error, there is no plain error. *Hood*, 2016 IL 118581, ¶ 18.

¶ 70    Moreover, having rejected each of defendant's individual claims of constitutional error, we necessarily reject his claim that he is entitled to a new trial based on the "cumulative effect" of the purported errors. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 118 ("There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue."). Our review of the record shows that defendant's trial was not conducted in contravention of any of his constitutional rights. We therefore affirm the judgment of the circuit court.

¶ 71                                    III. CONCLUSION
¶ 72    The judgment of the circuit court is affirmed.

¶ 73    Affirmed.